J-S63043-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| FERNANDO REAL, | : | |
| | : | |
| Appellant | : | No. 2690 EDA 2014 |

Appeal from the Judgment of Sentence entered on May 1, 2014
in the Court of Common Pleas of Philadelphia County,
Criminal Division, No(s): CP-51-CR-0008511-2008;
CP-51-CR-0008526-2008

BEFORE: DONOHUE, MUNDY and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.: **FILED NOVEMBER 20, 2015**

Fernando Real ("Real"), *pro se*,[1] appeals from the judgment of
sentence imposed after a jury convicted him of two counts each of first-
degree murder and robbery, and one count each of criminal conspiracy and
firearms not to be carried without a license.[2] We affirm.

The relevant factual background underlying this appeal is thoroughly
set forth in the trial court's Pa.R.A.P. 1925(a) Opinion, which we adopt and
incorporate herein by reference. **See** Trial Court Opinion, 12/9/14, at 2-6.

At the close of Real's trial, the jury found him guilty of the above-
mentioned offenses. The trial court subsequently imposed two consecutive

---

[1] After a hearing pursuant to **Commonwealth v. Grazier**, 713 A.2d 81 (Pa.
1998), the trial court permitted Real to proceed *pro se* on appeal.

[2] **See** 18 Pa.C.S.A. §§ 2502(a), 3701(a)(1)(i), 903, 6106(a)(1).

terms of life in prison on the first-degree murder convictions, plus an aggregate consecutive sentence of 21 to 67 years in prison. Real filed a post-sentence Motion, which the trial court denied. Real then filed a timely *pro se* Notice of Appeal, followed by a Pa.R.A.P. 1925(b) Concise Statement of Errors Complained of on Appeal.

On appeal, Real presents the following issues for our review:

A. Whether the trial court committed error[,] and thereby deprived [Real] of his due process right to a fair trial under the Pennsylvania and United States Constitutions[,] by admitting evidence that [Real] was seen shooting the murder weapon on an occasion separate from the crime[s] charged?

B. Whether the trial court committed error and thereby violated [Real's] right to a fair trial under the Pennsylvania and United States Constitutions, when the trial court denied [Real's] request for a mistrial after the [C]ommonwealth elicited evidence that it stipulated it would not introduce – [*i.e.,*] that [Real] shot someone on an occasion separate from the crime[s] charged?

C. Whether the trial court committed error and thereby violated [Real's] right to confrontation under the Pennsylvania and United States Constitutions by permitting the [C]ommonwealth to introduce the preliminary hearing testimony of [C]ommonwealth witness Ronald Milburn?

Brief for Appellant at 2.

Real first argues that the trial court erred, and deprived him of a fair trial, by improperly permitting the Commonwealth to introduce testimony, over defense counsel's objection, that, two nights after the murders involved

- 2 -

in this case, Real had fired a handgun,[3] which was later determined to match

the murder weapon used in this case. **See id.** at 8.[4]

Our standard of review concerning a challenge to the admissibility of

evidence is as follows:

> The admissibility of evidence is a matter for the discretion of the trial court and a ruling thereon will be reversed on appeal only upon a showing that the trial court committed an abuse of discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

**Commonwealth v. Johnson**, 42 A.3d 1017, 1027 (Pa. 2012) (citations and

quotation marks omitted).

In support of his claim, Real relies on **Commonwealth v. LeGares**,

709 A.2d 922 (Pa. Super. 1998). In **LeGares**, we held that the trial court

had erroneously admitted testimony (hereinafter "the challenged

testimony") that the appellant had, prior to the murder for which he was

---

[3] This incident occurred on September 11, 2002, and is hereinafter referred to as "the September 11 incident."

[4] The trial court overruled the defense's objection to the admissibility of this evidence, stating that "the only issue that's relevant – and I'll make it very clear to the jury – is the issue of identification, and the only reason this [evidence] comes in is to show whether or not there was a connection between ballistics evidence seized from the [September 11] incident … and ballistics evidence seized from the [murders in this case on September] 9th[.]" N.T., 10/12/12, at 27; **see also id.** at 31 (wherein the court stated that "to connect it[, *i.e.*, the gun used during both the September 11 incident and the murders two days prior,] with [Real], you have to have the eyewitnesses [who saw Real shooting the gun at the September 11 incident], … [who] can only say they saw where he was shooting it; and when they went there, there were casings … for the gun.").

- 3 -

charged, fired a sawed-off shotgun that was similar in appearance to the one used in the murder. *Id.* at 926. In so holding, we stated as follows:

> The Commonwealth argues that the [challenged testimony] was probative of the fact that appellant possessed and controlled the sawed-off shotgun. However, we disagree. First, [the challenged] testimony was not necessary to prove that appellant had access to the alleged murder weapon since the weapon was seized from appellant's apartment. More importantly, the Commonwealth's proof of appellant's prior **use** of the shotgun could only have established that appellant was criminally violent, that he was inclined to use the shotgun, and, inferentially, that appellant murdered [the victim].

*Id.*

According to Real, evidence that he had fired the murder weapon after the murders involved in this case could "only have established that [he] was criminally violent [and] inclined to use the [gun.]" Brief for Appellant at 8 (quoting **LeGares**, 709 A.2d at 926). According to Real, the trial court's "[a]dmitting this evidence prevent[ed] the jury from objectively considering [Real's] guilt or innocence for [the] crime charged, thus, requiring a new trial." Brief for Appellant at 8.

In its Pa.R.A.P. 1925(a) Opinion, the trial court concisely addressed Real's claim, discussed the applicable law, and determined that the court properly admitted the evidence that Real had fired the murder weapon during the September 11 incident. *See* Trial Court Opinion, 12/9/14, at 11-12; *see also* N.T., 10/12/12, at 27-31. We agree with the trial court's analysis and determination, and therefore affirm on this basis with regard to Real's first issue. *See* Trial Court Opinion, 12/9/14, at 11-12.

As an addendum, we conclude that Real's reliance upon **LeGares** is misplaced, as that case is distinguishable. The challenged testimony in **LeGares** was less probative than the evidence in the instant case. In **LeGares**, the shotgun was recovered in the defendant's apartment, which rendered the prior bad act testimony unnecessary to explain the shotgun's recovery or to create a nexus between the shotgun and the defendant. **See LeGares, supra**. Such circumstances are readily distinguishable from the instant case, wherein (1) evidence of Real's shooting the firearm after the murders in this case was necessary to show his access to the murder weapon; (2) the firearm's recovery by police was necessary to the unfolding of events; and (3) the potential for undue prejudice was minimal.

Next, Real contends that the trial court committed reversible error by denying Real's Motion for a mistrial. **See** Brief for Appellant at 10-11. Specifically, Real argues that the court should have granted a mistrial after a Commonwealth witness, Officer Christine Hilbert ("Hilbert"), improperly testified that a person had been shot during the September 11 incident, despite the Commonwealth's prior agreement that such evidence would not be introduced.[5] **See id.**

---

[5] The Commonwealth had stipulated, prior to Hilbert's testimony, that it would not introduce evidence that a person had been shot and killed during the September 11 incident. **See** N.T., 2/19/14, at 137-40, 182-87, 285, 287. However, the stipulation did not preclude the Commonwealth from introducing evidence that the ballistics evidence from the September 11 incident matched the firearm that had been used in the murders two days earlier. **Id.** at 137, 184.

"A mistrial is an 'extreme remedy' that is only required where the challenged event deprived the accused of a fair and impartial trial. The denial of a mistrial motion is reviewed for an abuse of discretion." ***Commonwealth v. Laird***, 988 A.2d 618, 638 (Pa. 2010) (citations omitted). "A trial court may grant a mistrial only where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." ***Commonwealth v. Chamberlain***, 30 A.3d 381, 422 (Pa. 2011) (citation and quotation marks omitted).

> [o]rdinarily, admission of testimony which describes, or from which the jury may infer, past criminal conduct by a defendant constitutes reversible error. **However, not all such references warrant reversal.** An isolated[,] passing reference to prior criminal activity will not warrant reversal unless the record indicates that prejudice resulted from the remark. **There is no *per se* rule which requires a new trial for every passing reference to prior criminal conduct.** Additionally, the possible prejudicial effect of a reference to prior criminal conduct may, under certain circumstances, be removed by a cautionary instruction.

***Commonwealth v. Fletcher***, 41 A.3d 892, 895 (Pa. Super. 2012) (emphasis in original, citation and ellipses omitted);[6] ***see also Chamberlain***, 30 A.3d at 422 (stating that a mistrial is not necessary where curative instructions are adequate to overcome prejudice; ***Commonwealth v. Manley***, 985 A.2d 256, 266 (Pa. Super. 2009) (stating that "[a] trial

---

[6] Though the ***Fletcher*** Court's holding concerns references to *prior* criminal activity, this same analysis applies here, where the improper remark concerned criminal conduct that occurred two days after the murders for which Real was on trial.

- 6 -

court may remove taint caused by improper testimony through curative instructions."). Moreover, it is well settled that "[a] jury is presumed to follow a trial court's instructions[.]" **Commonwealth v. Reid**, 99 A.3d 470, 501 (Pa. 2014).

> Courts must consider all surrounding circumstances before finding that curative instructions were insufficient and the extreme remedy of a mistrial is required. The circumstances which the court must consider include whether the improper remark was intentionally elicited by the Commonwealth, whether the answer was responsive to the question posed, whether the Commonwealth exploited the reference, and whether the curative instruction was appropriate.

**Manley**, 985 A.2d at 266-67 (internal citations omitted).

Real points out that Hilbert, who had responded to the scene of the September 11 incident and observed a man running from the scene, testified that "[w]hen I arrived[,] … [t]here was a male lying on the ground bleeding." N.T., 2/19/14, at 181; **see also** Brief for Appellant at 10. According to Real, Hilbert's improper statement "undoubtedly aroused prejudice in the minds of the jurors by implying that [Real] had the propensity to [shoot people]." Brief for Appellant at 11 (quoting **Commonwealth v. Ford**, 607 A.2d 764, 766 (Pa. Super. 1992) (where a Commonwealth witness improperly testified, at the appellant's jury trial on arson charges, that the appellant had been previously charged with arson, holding that the trial court should have granted a mistrial because the prejudicial statement "unnecessarily conveyed to the jury that appellant had

- 7 -

a prior criminal record[,]" and the trial court did not issue a cautionary instruction)).

Hilbert's challenged testimony, when placed in context, is as follows:

Q. [The Commonwealth]: And what did you do once you lost that person, the person you were chasing[, *i.e.*, concerning the shots fired at the September 11 incident], what did you do then?

A. [Hilbert]: I started to search for the male and as I was searching for the male[,] I heard a lot of screaming coming about maybe like a quarter of a city block down from me. I actually ran to that area to help control. This is where the shooting actually was.

Q. [The Commonwealth]: Now --

[Defense counsel]: Objection.

THE COURT: As to that's where the shooting actually was?

[Defense counsel]: Yes.

THE COURT: All right. I will strike that reference since she didn't – unless you can establish she had personal knowledge where the shooting actually was.

Q. [The Commonwealth]: When you got to that location[,] did you observe ballistics evidence at the location you went to?

A. [Hilbert]: When I arrived at where the screaming was, there was a large crowd. *There was a male lying on the floor bleeding*.

[Defense counsel]: Objection.

N.T., 2/19/14, at 180-81 (emphasis added). Real's counsel requested a sidebar, and moved for a mistrial, after the jury had been excused. *Id.* at 181-82. The trial court then heard extensive argument from both counsel concerning the mistrial Motion. *Id.* at 181-98.

- 8 -

The trial court denied the mistrial Motion, finding that the prosecutor did not intentionally elicit Hilbert's testimony that she saw a man on the ground bleeding. *See* N.T., 2/19/14, at 195, 198-99; *see also Manley*, 985 A.2d at 267. Rather, the court found that the prosecutor had sought to question Hilbert as to whether she saw ballistics evidence at the scene, which was a proper line of inquiry. *See* N.T., 2/19/14, at 194-95. The trial court additionally stated that the prosecutor would not be exploiting Hilbert's improper comment to argue that a person had been shot and killed during the September 11 incident. *See id.* at 195-96; *see also Manley*, 985 A.2d at 267. Upon the jury's return to the courtroom, the trial court gave the following curative instruction:

> THE COURT: All right. Ladies and gentlemen, I am going to sustain that last objection and I'm going to instruct you folks to disregard the last answer that was given by the witness, okay. What I mean by that is you are not to consider it in any way when you are making your decision in this case. It's as if you had never heard it, put it out of your heads.

N.T., 2/19/14, at 199.

Though Hilbert's improper remark, arguably, could have prejudiced Real, the remark was passing, and we determine that the trial court's curative instruction was appropriate and adequate to overcome any undue prejudice to Real. *See Fletcher, supra* (stating that the possible prejudicial effect of a reference to prior criminal conduct may, under certain circumstances, be removed by a cautionary instruction); *see also Chamberlain, supra*. Furthermore, any potential prejudice from Hilbert's

- 9 -

remark did not rise to the level of preventing the jury from weighing and rendering a true verdict. ***See Chamberlain, supra***. This case involved a lengthy jury trial, with myriad Commonwealth witnesses, including testimony that Real had admitted to shooting the two victims, as well as evidence linking Real to the murder weapon. Overall, the evidence presented at trial overwhelmingly established Real's guilt, and significantly outweighed any prejudice resulting from Hilbert's isolated remark. ***See Fletcher***, 41 A.3d at 896 (holding that even if the passing remark concerning the defendant's prior criminal activity was prejudicial, any prejudice did not warrant the grant of a mistrial, since (1) there was uncontradicted eyewitness testimony detailing the defendant's involvement in the crime; (2) "the evidence presented at trial overwhelmingly established [the defendant's] guilt and significantly outweighed any prejudice resulting from the reference to [the defendant's] prior criminal activity"; and (3) the trial court issued a curative instruction after the improper reference).

Moreover, the record supports the trial court's findings that the prosecutor did not intentionally elicit Hilbert's improper remark, and that the Commonwealth did not, and would not, exploit the remark. ***See Manley, supra***. Finally, we determine that Real's reliance upon ***Ford*** is misplaced, as the trial court in ***Ford***, unlike here, did not give the jury a curative instruction after the improper testimony. ***See Ford***, 607 A.2d at 767. We

- 10 -

therefore discern no abuse of discretion by the trial court in denying Real's Motion for a mistrial.

Finally, Real argues that the trial court violated his constitutional right to confront his accusers when it admitted into evidence, over the defense's objection, the preliminary hearing testimony of Commonwealth witness Ronald Milburn ("Milburn"), whom the trial court deemed to be unavailable at trial. **See** Brief for Appellant at 12-13.[7] According to Real, he never had a chance to adequately cross-examine Milburn as to (1) "Milburn's statement to police where he misidentifies the murder weapon"; and (2) the fact that "Milburn's own mother says Milburn lied during his preliminary hearing testimony." **Id.** at 12.

In its Opinion, the trial court thoroughly addressed Real's claim, discussed the applicable law, and determined that the court did not err in admitting Milburn's preliminary hearing testimony, since it was admissible under an exception to the rule against hearsay, and Real's defense counsel had a full and fair opportunity to cross-examine Milburn at the preliminary

---

[7] Milburn testified at the preliminary hearing that he was present at the craps game on September 11, 2002, and he saw Real fire a nine-millimeter handgun multiple times, and run from the scene. N.T., 2/24/14, at 129-31.

hearing. *See* Trial Court Opinion, 12/9/14, at 8-11. We agree with the trial court's analysis and determination, and affirm on this basis with regard to Real's final issue. *See id.*[8]

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/20/2015

---

[8] As an addendum, we observe that Real proffers no evidence in support of his assertion that Milburn's mother stated that Milburn had lied during his preliminary hearing testimony. Moreover, Real failed to preserve this claim in the trial court, prior to the filing of his Pa.R.A.P. 1925(b) Concise Statement, and it is therefore waived on appeal. *See* Pa.R.A.P. 302(a) (stating that an issue cannot be raised for the first time on appeal); *see also Commonwealth v. Melendez-Rodriguez*, 856 A.2d 1278, 1288 (Pa. Super. 2004) (holding that "[a] party cannot rectify the failure to preserve an issue by proffering it in response to a Rule 1925(b) order.") (citation omitted). Real did not object to the trial court's ruling admitting Milburn's preliminary hearing testimony on the basis that Milburn's mother allegedly would have refuted such testimony, nor did Real seek to present Milburn's mother as a witness at trial.

- 12 -

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF<br>PENNSYLVANIA | : | CP-51-CR-0008511-2008 |
| | CP-51-CR-0008526-2008 Comm. v. Real, Fernando<br>Opinion | CP-51-CR-0008526-2008 |
| v. | | **FILED** |
| FERNANDO REAL | ‖‖‖‖‖‖‖‖‖‖‖‖‖<br>7232125471 | DEC 09 2014 |
| | OPINION | Criminal Appeals Unit<br>First Judicial District of PA |
| BRONSON, J. | | December 9, 2014 |

On February 25, 2014, following a capital murder jury trial before this Court, defendant

Fernando Real was convicted of two counts of first degree murder (18 Pa.C.S. § 2502), two

counts of robbery (18 Pa.C.S. § 3701), one count of conspiracy to commit robbery (18 Pa.C.S. §

903), and one count of carrying a firearm without a license (18 Pa.C.S. § 6106). On February 28,

2014, the jury returned a verdict of life in prison on both counts of first degree murder. The

Court deferred the imposition of sentence and ordered a presentence report and mental health

evaluation. On May 1, 2014, before the commencement of sentencing, defendant asked to

represent himself at sentencing and on appeal. After a hearing, the Court granted defendant's

request to proceed *pro se*. The Court thereafter imposed an aggregate sentence of two

consecutive life sentences plus 21 to 67 years incarceration in state prison. Defendant filed post-

sentence motions, which the Court denied on August 15, 2014.

Defendant has now appealed *pro se* from the judgment of sentence entered by the Court

on the grounds that: 1) the Court erred in admitting evidence of defendant's flight, since this

evidence had been previously ruled inadmissible by another judge of coordinate jurisdiction; 2)

the Court erred in permitting a deputy sheriff to testify regarding a statement defendant

allegedly made regarding an incident unrelated to the charged crimes; 3) the Court erred in denying defendant's motion for mistrial after Commonwealth witness Christine Hilbert testified to an uncharged shooting that the Commonwealth had previously agreed would not be revealed to the jury; 4) the Court erred in permitting the Commonwealth to introduce witness Ronald Milburn's prior recorded testimony at trial; 5) the Court erred in permitting witness Christine Hilbert's in-court identification of defendant, as such identification had been previously ruled inadmissible; and 6) the Court erred in admitting evidence that defendant fired the alleged murder weapon on September 11, 2002, two days after the charged killings, as firing the weapon was irrelevant and collateral to possession of the weapon. Statement of Errors Complained of on Appeal ("Statement of Errors") at ¶¶ 1-6. In addition, defendant lists as grounds for relief 14 separate instances of alleged ineffective assistance of counsel. Statement of Errors at ¶¶ 6-19.[1] For the reasons set forth below, defendant's claims are without merit and the judgment of sentence should be affirmed.

## I. FACTUAL BACKGROUND

At trial, the Commonwealth presented the testimony of Philadelphia Deputy Sheriff Bilin Cabrera, Philadelphia Police Detective James Burke, Philadelphia Police Officers James Putro, William Whitehouse, Christine Hilbert, Craig Perry, John Cannon, William Lackman, Lamont Fox, and Theresa Paris, North Hampton Township Police Officer Ryan Share, Federal Bureau of Investigation Agent Edward Frimel, New Jersey State Police Detective Louis Kinkle (Ret.), New Jersey State Police Lieutenant Mark Rowe, Mapleshade, New Jersey Police Officer James Gillespie, Medical Examiners Dr. Marlon Osbourne and Dr. Ian Hood, Lissette Vega, Brian Heard, Terrell Boyd, Willie Hines, Karl May, and Gabriel Piorko. Defendant presented by

---

[1] Paragraph 6 of the Statement of Errors includes both a claim of trial court error and a claim of ineffective assistance of counsel.

2

stipulation the testimony of James Lane and Philadelphia Police Officer Alebert Revel. Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence established the following.

In the early morning hours of September 9, 2002, defendant and Terrell Boyd, who had known each other since childhood, were driving around the Frankford section of Philadelphia looking for someone to rob.[2] N.T. 2/19/14 at 19-21. While driving in defendant's white Ford Taurus, defendant showed Boyd a nine millimeter firearm. N.T. 2/19/14 at 21-22; 2/24/14 at 93-94. At approximately 4:30 a.m., after one failed robbery attempt, defendant and Boyd drove to Hawthorne Street. N.T. 2/18/14 at 150; 2/19/14 at 23-24. Upon arriving at Hawthorne Street, Boyd agreed to stand watch for defendant at the corner of Hawthorne and Bridge Street. N.T. 2/19/14 at 25, 44, 153, 235. Boyd did not wish to be seen on the block, as his children's mother lived in that location at the time and Boyd feared that he could be recognized. N.T. 2/19/14 at 24-25.

Leaving Boyd at the corner, defendant approached Marcus Herbert and Byron Story, who were sitting on the porch outside of Herbert's home. N.T. 2/19/14 at 153, 232. Defendant initiated a conversation with Story and Herbert, asking if they had any marijuana to sell. N.T. 2/19/14 at 153. Defendant then shot Story once, at close range, in the head. N.T. 2/19/14 at 153; 2/20/14 at 75-77. Once Story had been shot, Herbert attempted to run, whereupon defendant shot Herbert twice in the back. N.T. 2/19/14 at 153; 2/24/14 at 112, 114-116.

Upon hearing the three gunshots, Boyd ran back to defendant's parked car and awaited defendant's return. N.T. 2/19/14 at 27-28, 154. Shortly thereafter, defendant returned to the car. N.T. 2/19/14 at 28-29, 233-234. Boyd told defendant not to slam the car door shut, fearing that someone would look in the direction of the noise and see defendant's vehicle. N.T. 2/19/14 at

---

[2] Defendant was also known as "T". N.T. 2/19/14 at 19. Boyd was also known as Joey Black. N.T. 2/19/14 at 20.

3

28-29. Defendant and Boyd then left the area. N.T. 2/19/14 at 29. While driving away from Hawthorne Street, defendant told Boyd that he had shot one person in the head and one person twice in the back as the person tried to run. N.T. 2/19/14 at 29-30. Defendant further stated that he had taken a small amount of money and some marijuana from the people he had shot. N.T. 2/19/14 at 30.

Shortly after the shooting, police responded to the scene and observed Story lying on the porch, bleeding from the head. N.T. 2/18/14 at 151; 2/19/14 at 234. Police also encountered Herbert lying on the ground in front of the house, bleeding from his back. N.T. 2/18/14 at 151. Herbert informed police that he had been shot by a Hispanic male with short cropped hair, wearing a white shirt and blue jeans, and carrying a black handgun. N.T. 2/18/14 at 152. Herbert was transported to Hahnemann University Hospital for treatment, while Story was pronounced dead at the scene. N.T. 2/18/14 at 152-153. Police recovered two fired 9 millimeter cartridge cases at the scene of the shooting. N.T. 2/18/14 at 172-173, 185. Herbert died on October 2, 2003, more than one year after the shooting, due to multiple recurring infections as a result of the gunshot wounds he had received. N.T. 2/24/14 at 117-118.

On September 11, 2002, in the Whitehall Projects in the Frankford section of Philadelphia, two days after the shooting of Story and Herbert, defendant was seen by Ronald Milburn at the scene of a craps game firing a nine millimeter firearm multiple times. N.T. 2/20/14 at 138-139, 151-153, 166; 2/24/14 at 130, 144.[3]  Milburn had seen defendant in a bar approximately one week earlier in possession of what appeared to be that same weapon. N.T.

---

[3] Milburn actually saw more than defendant merely firing a gun. He saw defendant shoot and kill one Levon Wilson with the gun after a dispute at the craps game. Because, as discussed below, the gun used by defendant to shoot Levon Wilson turned out to be the murder weapon in the killings here at issue, the Commonwealth proved that defendant fired the gun on September 11, 2002, to establish his access to the murder weapon. However, because defendant was not on trial for the killing of Wilson in the case at bar, the Commonwealth agreed not to present any evidence that the gun had been used on September 11, 2002, in a murder. Defendant was convicted of murdering Wilson in a separate trial, as is more fully discussed below.

2/24/14 at 130-131. At the time that defendant fired the gunshots at the craps game, Police officers Christine Hilbert[4] and Stanley Galiczynski were parked in a marked police car on the 4900 block of Cottage Street. They heard the gunshots coming from the Whitehall Projects immediately to their south. N.T. 2/19/14 at 177-178. As the officers approached the area, Officer Hilbert saw defendant run from the area where the shots had been fired. N.T. 2/19/14 at 179, 207; 2/24/14 at 131, 144. Upon seeing the police vehicle, defendant flattened himself against a wall until Officer Hilbert exited the vehicle, at which time defendant fled. N.T. 2/19/14 at 179-180. Officer Hilbert was unable to locate defendant, but did recover a firearm from the location where defendant had fled. N.T. 2/19/14 at 109, 180, 200, 206. Police recovered 13 nine-millimeter fired cartridge casings from the area where defendant had been seen firing a gun. N.T. 2/19/14 at 104; 2/20/14 at 49-50. Analysis of the fired cartridge casings found at both the Hawthorne Street shooting of Herbert and Story and the Whitehall Projects shooting determined that all the casings had been fired in the firearm recovered by Officer Hilbert from the location from which defendant had fled. N.T. 2/20/14 at 58, 63-64.

Police made numerous attempts to locate defendant from late 2002 until September 2003. N.T. 2/24/14 at 34-43. Defendant was ultimately located and apprehended on September 30, 2003 at the Rodeway Inn in Mapleshade, New Jersey, where he had registered under an alias. N.T. 2/24/14 at 41-43, 50, 65. Defendant asked what he was under arrest for, to which the arresting officers stated "[f]or some shootings." N.T. 2/24/14 at 71. Defendant responded that "[he] liked shooting people." N.T. 2/24/14 at 71-72. Defendant further provided a different alias at the time of his arrest. N.T. 2/24/14 at 78.

On February 7, 2004, while incarcerated, defendant was involved in an incident in the cellblock. N.T. 2/24/14 at 100-101. When asked by a corrections officer, "[w]hy do you keep

---

[4] Officer Hilbert was previously named Christine Vincent. N.T. (Motion Hearing) 2/18/14 at 22.

5

doing these things?" defendant responded "I don't give a shit, I got two bodies, I'm going to die in prison, I don't care." N.T. 2/24/14 at 101.

## II. DISCUSSION

### A. Introduction of Evidence

Defendant raises several claims of error relating to the Court's admission or exclusion of evidence at trial.[5] The law concerning the admission of evidence in Pennsylvania is well settled:

> The admission of evidence is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed only upon a showing that the trial court abused its discretion. In determining whether evidence should be admitted, the trial court must weigh the relevance and probative value of the evidence against the prejudicial impact of that evidence. Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact. Although a court may find that evidence is relevant, the court may nevertheless conclude that such evidence is inadmissible on account of its prejudicial impact.

*Commonwealth v. Reid*, 811 A.2d 530, 550 (Pa. 2002) (internal citations omitted); *see* Pa.R.E. 401-403.

### 1. Evidence of Flight

Defendant first claims that the "Court erred in permitting the Commonwealth to introduce evidence of defendant's flight when Judge Minehart already ruled that this evidence would be inadmissible violating the coordinate jurisdiction rule, the law of the case doctrine, and defendant's due process and rights to a fair trial granted in the United States and Pennsylvania Constitutions." Statement of Errors at ¶ 1. This claim is belied by the record.

Judge Jeffrey Minehart, of this Court, held pretrial hearings on this case on October 10, 2012, in order to assist the trial judge in getting the case ready for trial.[6] During the proceedings

---

[5] Defendant's claims have been reorganized for ease of analysis.

[6] At the time, the assigned trial judge was Senior Judge Carolyn Temin, who has since retired. The case was subsequently reassigned to the undersigned trial judge.

6

in front of Judge Minehart, defense counsel sought to exclude evidence of flight on the ground that "there is no indication that there be any active flight in this case." N.T. 10/10/12 at 59. Contrary to defendant's claim on appeal, Judge Minehart never ruled that evidence of flight would be inadmissible. Instead, with the agreement of defense counsel, Judge Minehart directed that the trial judge, after hearing how the evidence in the case evolved, would decide whether flight evidence would be admissible. N.T. 10/10/12 at 59.

At trial, this Court properly admitted the evidence of flight. It is well-established that evidence of flight is relevant and admissible to establish an inference of guilt. *See, e.g., Commonwealth v. Rolan*, 964 A.2d 398, 410 (Pa. Super. 2008). Here, the evidence that, after the killings at issue, defendant left Philadelphia, checked into a hotel using an alias, and could not be found for months, was clearly relevant and properly admitted. *Id.*

### 2. Defendant's Admissions to a Corrections Officer While Incarcerated

Defendant next claims that the "Court erred in permitting the Commonwealth to introduce Sheriff Billin [sic] Cabrera's testimony regarding a statement defendant allegedly made concerning a [sic] entirely separate and unrelated incident to the crime charged. Cabrera's testimony was irrelevant and prejudicial..." Statement of Errors at ¶ 2. This claim is without merit.

At the pretrial proceedings in front of Judge Minehart on October 10, 2012, defense counsel moved *in limine* to exclude from evidence a statement made to Deputy Sheriff Cabrera on February 9, 2004, when Cabrera was a corrections officer. N.T. 10/10/12 at 52-58. Specifically, while incarcerated at the Detention Center in Philadelphia, defendant was involved in an incident that prompted Cabrera to ask defendant, "Why you keep doing these things?"

7

Defendant responded "I don't give a shit, I got two bodies, I'm going to die in prison, I don't care." N.T. 2/24/14 at 100-101.

As the Commonwealth was alleging that defendant had shot and ultimately killed two people in the early morning of September 9, 2002, defendant's statement that he had "two bodies" and was "going to die in prison" was highly probative of defendant's guilt in this case. Accordingly, Judge Minehart properly ruled *in limine* that defendant's statement to Cabrera was admissible.

### 3. Ronald Milburn's Prior Testimony

Defendant next claims that the "Court erred when it allowed the Commonwealth to introduce Commonwealth witness Ronald Milburn's prior recorded testimony at trial when defendant never had the opportunity to confront Milburn with the fact that he misidentified the murder weapon in his interviewed statement to police and that his own mother says he was not present when the shooting happened on September 11, 2002 – impeaching his testimony." Statement of Errors at ¶ 4. This claim is without merit.

The testimony here at issue was given by Milburn at defendant's preliminary hearing on the murder charges arising out of a shooting two days after the shootings of Herbert and Story. As noted above, defendant shot and killed Levon Wilson on September 11, 2002, using the gun that he had used to kill Herbert and Story. *See* note 3, *supra.* This Court allowed the Commonwealth to prove that on September 11, 2002, defendant fired the gun that was used to kill Herbert and Story two days before, since the firing of the weapon was relevant to show that defendant was in possession of the gun used to kill Herbert and Story. Milburn was an eyewitness to the Wilson shooting. Defendant now argues that the Court erred in allowing the

8

Commonwealth to read the relevant portions of Milburn's preliminary hearing testimony from the Wilson murder case.

Under Pennsylvania Rule of Evidence 804(b)(1), where a witness is unavailable to testify, the witness's testimony at a prior hearing may be admitted in evidence as an exception to the hearsay rule, provided that the party against whom the testimony is offered had an opportunity and similar motive to develop [the testimony]...." Pa.R.E. 804(b)(1). In the context of a criminal trial, so long as the witness is unavailable, that witness's prior testimony at a preliminary hearing is admissible under this exception to the hearsay rule, and satisfies the requirements of the Confrontation Clause, so long as defense counsel had a full and fair opportunity to cross-examine the witness at the preliminary hearing. *See Commonwealth v. Leak*, 22 A.3d 1036, 1045 (Pa. Super. 2011). Where a defendant asserts that he did not have a full and fair opportunity to cross-examine the witness at the preliminary hearing, he must establish that he was deprived of "vital impeachment evidence" at or before the time of the preliminary hearing. *Id.* at 1044-1045. "The Commonwealth may not be deprived of its ability to present inculpatory evidence at trial merely because the defendant, despite having the opportunity to do so, did not cross-examine the witness at the preliminary hearing as extensively as he might have done at trial." *Leak*, 22 A.3d at 1045 (quoting *Commonwealth v. Cruz-Centeno*, 668 A.2d 536, 542 (Pa. Super. 1995)). Rule 804 defines "unavailability" to include a witness who "cannot be present or testify at the trial or hearing because of death or a then-existing infirmary, physical illness, or mental illness." Pa.R.E. 804(a)(4).

Here, the admissibility of Milburn's preliminary hearing testimony was first litigated at defendant's trial for murdering Wilson. Defendant was convicted of murdering Wilson, and his conviction was upheld by the Superior Court, well before defendant's trial here at issue for

9

killing Story and Herbert. *See Commonwealth v. Real,* No. 2022 EDA 2005 (Pa. Super. March 4, 2009) (non-precedential decision). Milburn was in an automobile accident and was physically and mentally incapable of testifying at the Wilson murder trial. The trial judge held that Milburn was unavailable to testify and that defendant had a full and fair opportunity to cross-examine Milburn at the preliminary hearing. Accordingly, the Court admitted the preliminary hearing testimony under Rule 804. This ruling was upheld by the Superior Court. *Id.* at 3-8.

Because the Superior Court had already determined that Milburn's preliminary hearing testimony was admissible at the time of defendant's trial for murdering Wilson, the sole issue before this Court in determining whether Milburn's preliminary hearing testimony was here admissible was whether Milburn remained unavailable to testify at the trial of the instant case, held years after defendant's trial for killing Wilson. Therefore, the Court conducted a hearing, outside the presence of the jury, to assess Milburn's current status. Dr. Michael Marino, Milburn's treating physician, testified that Milburn had been in an automobile accident in 2004 and sustained traumatic brain injury. N.T. 2/20/14 at 120. According to Dr. Marino, as a result of this accident, Milburn still has difficulty both understanding and expressing language, suffers from impaired cognition, including memory and processing, and requires all day supervision and daily attendant care. N.T. 2/20/14 at 121. Milburn was unable to consistently and accurately state basic information, including such information as his birth date, where he was born, or where he lives, and has difficulty in making and recalling new memories. N.T. 2/20/14 at 121-122. All of this was compelling evidence that Milburn remained unavailable to testify within the meaning of Rule 804(b)(1).

10

The Court therefore did not err in permitting the Commonwealth to present the relevant portions of Milburn's preliminary hearing testimony, since that testimony was admissible in evidence under the former testimony exception to the hearsay rule.

4. Evidence of Defendant Firing a Weapon After the Killings Here at Issue

Defendant next claims that the "Court erred in permitting the Commonwealth to introduce evidence of defendant firing the alleged murder weapon on September 11, 2002. Defendant firing the murder [weapon] was irrelevant and collateral to possession." Statement of Errors at ¶ 6. This claim is without merit.

While evidence of other acts is not admissible to prove bad character or criminal propensity, it may be admitted for other purposes where the probative value of the evidence outweighs the potential for prejudice. Pa.R.E. 404(b); see Commonwealth v. Williams, 896 A.2d 523, 539 (Pa. 2006). Among the purposes for which evidence of other acts may be offered is to demonstrate defendant's opportunity, intent, identity, or to show absence of mistake or accident. Pa.R.E. 404(b)(2). Other acts are also admissible if they are part of the sequence of events surrounding the charged offense and are necessary for the "complete story" to be told to the fact-finder. Williams, 896 A.2d at 539. The admission of other acts by the trial court will only be reversed upon a showing of an abuse of discretion. Commonwealth v. Chmiel, 889 A.2d at 501, 534 (Pa. 2005) (citing Commonwealth v. Simmons, 662 A.2d 621, 635 (Pa. 1995)). Further, "[a] weapon shown to have been in a defendant's possession may properly be admitted into evidence, even though it cannot positively be identified as the weapon used in the commission of a particular crime, if it tends to prove that the defendant had a weapon similar to the one used in the perpetration of the crime. Any uncertainty that the weapon is the actual weapon used in the

11

crime goes to the weight of such evidence." *Commonwealth v. Williams*, 640 A.2d 1251, 1260 (Pa. 1994).

Here, the Commonwealth introduced evidence that defendant, two nights after the shooting on Hawthorne Street, was in possession of, and fired, a nine-millimeter handgun that was ultimately determined to be the same weapon used on Hawthorne Street to shoot and kill Herbert and Story. N.T. 2/20/14 at 58, 63-64, 138-139, 151-153, 166; 2/24/14 at 130, 144. Defendant was further seen in possession of what appeared to be this firearm a few days before the Hawthorne Street shooting. N.T. 2/24/14 at 130-131. That defendant possessed the murder weapon, both prior to and following the shooting on Hawthorne Street, is extremely probative of defendant's guilt, proving both defendant's access to the firearm and his identity as the shooter. Introduction of the September 11 shooting was further necessary to establish how the weapon used to shoot Herbert and Story was recovered by the police.

Moreover, while the Court permitted the Commonwealth to prove that defendant fired the weapon on September 11 in order to prove that he exercised dominion and control over the gun, the Commonwealth volunteered not to present any evidence that defendant had shot and killed someone (that is, Levon Wilson) in the course of that firing. This limitation clearly avoided any undue prejudice inuring to defendant from the evidence of the events transpiring on September 11.

Accordingly, the Court did not err in admitting evidence of defendant's possession of the murder weapon on September 11, 2002.

*B. Motion for Mistrial Based on Christine Hilbert's Testimony*

Defendant next claims that the "Court erred in denying defendant's requested mistrial after Commonwealth witness Christine Hilbert testified that a person was found shot at the

12

September 11, 2002 shooting scene – violating an agreement...that this evidence would not be admitted at trial." Statement of Errors at ¶ 3. This claim is without merit.

> A mistrial is an extreme remedy ... [that] ... must be granted only when an incident is of such a nature that its unavoidable effect is to deprive defendant of a fair trial. A trial court may remove taint caused by improper testimony through curative instructions. Courts must consider all surrounding circumstances before finding that curative instructions were insufficient and the extreme remedy of a mistrial is required. The circumstances which the court must consider include whether the improper remark was intentionally elicited by the Commonwealth, whether the answer was responsive to the question posed, whether the Commonwealth exploited the reference, and whether the curative instruction was appropriate.

*Commonwealth. v. Manley*, 985 A.2d 256, 266-67 (Pa, Super. 2009) (internal citations and quotations omitted).

Prior to Officer Hilbert's testimony, the Commonwealth agreed that it would prove that defendant fired the murder weapon on September 11, 2002, without referring to the fact that in so doing, defendant had shot and killed Levon Wilson. N.T. 2/18/14 at 33-36; 2/19/14 at 137-142, 186-187. During Officer Hilbert's testimony at trial, the following exchange took place regarding the events that occurred after shots were fired in the September 11 incident:

> **Ms. Fairman**: And what did you do once you lost that person, the person you were chasing, what did you do then?
> **Officer Hilbert**: I started to search for the male and as I was searching for the male I heard a lot of screaming coming about maybe like a quarter of a city block down from me. I actually ran to that area to help control. This is where the shooting actually was.
> **Ms. Fairman**: Now --
> **Mr. Stein**: Objection.
> **The Court**: As to that's where the shooting actually was?
> **Mr. Stein**: Yes.
> **The Court**: All right. I will strike that reference since she didn't – unless you can establish she had personal knowledge of where the shooting actually was.
> **Ms. Fairman**: When you got to that location did you observe ballistics evidence at the location you went to?
> **Officer Hilbert**: When I arrived at where the screaming was, there was a large crowd. There was a male laying on the ground bleeding.
> **Mr. Stein**: Objection.

13

N.T. 2/19/14 at 180-181. The Court then heard arguments outside the presence of the jury regarding defendant's motion for a mistrial due to the officer's reference to a gunshot victim in violation of the Commonwealth's agreement. N.T. 2/19/14 at 181-198. The Court found that the prosecutor did not intentionally elicit the testimony that there was a male on the ground bleeding, but rather sought to question the officer concerning ballistics evidence found at the scene. N.T. 2/19/14 at 190-191, 195. The Court further stated that the Commonwealth would not be exploiting the statement to argue that another person had been killed and gave a curative instruction immediately upon the jury reentering the courtroom. N.T. 2/19/14 at 195-196, 199. Accordingly, the Court did not err in denying defendant's motion for mistrial following the testimony of Officer Hilbert.

### C. In-Court Identification of Defendant by Christine Hilbert

Defendant next claims that the "Court erred in permitting Police Officer Christine Hilbert's in-court identification of defendant as the male seen fleeing the September 11, 2002 shooting scene, since Judge Rose Marie Defino-Nastasi already ruled it should not be admissible." Statement of Errors at ¶ 5. This claim is without merit.

As stated above, Officer Hilbert saw defendant running from the area of the Whitehall Projects immediately after the shooting and killing of Levon Wilson at a craps game. About a month after the shooting, Officer Hilbert saw a wanted poster at the police district and recognized defendant, the person in the poster, as the person she saw fleeing the scene of the murder of Wilson. N.T. (Motion) 2/18/2014 at 34. During her preparation session with an assistant district attorney for defendant's trial for murdering Wilson, she was shown the poster with defendant's photograph and confirmed that he was the person she saw fleeing the murder scene. At the actual trial, she identified defendant as the perpetrator. However, defense counsel

14

at the Wilson murder trial was never told that Hilbert had made an out-of-court identification of defendant, and was unaware that Hilbert would make an identification in court. As a result, defense counsel never had an opportunity to make a pretrial claim that the identification evidence should be suppressed. This led defense counsel to make a claim of prosecutorial misconduct based on the failure to make pretrial disclosure of an identification witness. This problem was compounded when both the trial court, and the Superior Court, rejected defendant's prosecutorial misconduct claim based upon a factual error, that is, a belief that Hilbert had never made a pretrial identification of defendant, when, in fact, she had. *See Commonwealth v. Real,* No. 2022 EDA 2005 (Pa. Super. March 4, 2009) at 11-14 (adopting the opinion of the trial court, which incorrectly stated that Hilbert first identified defendant at the trial). This error led defendant, in PCRA proceedings before Judge DeFino-Nastasi, to claim that both trial counsel and direct appeal counsel in the Wilson murder case were ineffective. Judge DeFino-Nastasi, in ruling on defendant's PCRA petition, agreed that this claim had arguable merit. *See* N.T. (CP-51-CR-0207721-2004) (PCRA hearing) 5/3/13 at 13-20.[7]

The circumstances in the case at bar are completely different. Here, unlike the Wilson murder trial, defense counsel had full disclosure of all of the identifications made by Hilbert well before trial, and was able to raise all of the identification issues in an extensive pretrial hearing. *See* N.T. (Motion) 2/18/14 at 7-92 (hearing on motion to suppress identification evidence). Following the hearing, this Court excluded Hilbert's pretrial identification of defendant in the prep session with the assistant district attorney, but permitted Hilbert to testify that she had recognized defendant on the poster in the police district, and allowed her to make an in-court

---

[7] Notwithstanding this finding, Judge DeFino-Nastasi denied the PCRA petition on the ground that counsel's error did not prejudice defendant. *Id.* at 20-21.

identification. Nothing in Judge DeFino-Nastasi's decision, which was premised upon a claim of discovery violations arising at a different trial, barred that decision. No relief is due.

### D. Ineffective Assistance of Counsel

Finally, defendant claims that trial counsel was ineffective on the grounds that: 1) counsel failed to object to the Court's instructions to the jury regarding the jury's use of written jury instructions; 2) counsel failed to object to the Court prohibiting the jurors from using their notes during deliberations; 3) counsel failed to call witnesses regarding defendant's reputation for truthfulness, honesty, and veracity; 4) counsel failed to object to the Commonwealth's striking every Hispanic venireperson; 5) counsel failed to object and request a mistrial following witness Karl May's testimony that May was instructed to testify that he had seen two males at the scene of the shooting; 6) counsel failed to request that Karl May's testimony be stricken from the record or request that the jury be instructed to view May's testimony with caution; 7) counsel failed to file a motion in limine to preclude any references to defendant firing the murder weapon on September 11, 2002 and at a local bar one week prior; 8) counsel failed to conduct a meaningful investigation to locate potential eyewitness "Lisa"; 9) counsel failed to object to the Commonwealth's questions to Willie Hines, on re-direct, regarding Hines' conversation with defendant, wherein defendant admitted to committing the crimes of which he was charged; 10) counsel failed to impeach witness Brian Heard's testimony that he did not make a statement to police on September 11, 2002; 11) counsel failed to locate and interview witness Ronald Milburn's mother; 12) counsel failed to investigate defendant's alibi that he was at work in New Jersey at the time of the murders; 13) counsel failed to call Detective Egenlauf as a witness regarding the results of the photographic identification by witness James Lane; 15) counsel failed to argue that witness Christine Hilbert should have been precluded from making an in-court

16

identification of defendant as Judge Defino-Nastasi previously had ruled it should not be admissible; and 15) the cumulative effect of counsel's ineffectiveness deprived defendant of a fair trial. Statement of Errors at ¶¶ 5, 7-19.

Allegations of ineffective assistance of counsel ordinarily may not be raised on direct appeal and must be deferred until collateral review. *Commonwealth v. Grant*, 813 A.2d 726 (Pa. 2002). In *Commonwealth v. Holmes*, 79 A.3d 562, 577-78 (Pa. 2013), our Supreme Court recognized two limited exceptions to the *Grant* rule when there is (1) a discrete claim of ineffectiveness that is "both meritorious and apparent from the record so that immediate consideration and relief is warranted," or (2) "where the defendant seeks to litigate multiple or prolix claims of counsel ineffectiveness" with good cause shown and a knowing and express waiver of PCRA rights. As defendant's multiple claims of trial counsel's ineffectiveness do not fall within either exception under *Holmes*, defendant's claims of trial counsel's ineffectiveness are not reviewable on direct appeal.

## III. CONCLUSION

For all of the foregoing reasons, the Court's judgment of sentence should be affirmed.

BY THE COURT:

_____
GLENN B. BRONSON, J.

17